Patrick Morrow, et al., Appellants, v. Otto Mutz and John W. Fulk, Appellees.

**Quieting title:** ACCRETION: AVULSION: EVIDENCE. In this action to quiet title to land lying along the Missouri river, the evidence is reviewed and held to show that the land in question is west of the river, due to gradual erosion rather than to a change in the course of the river by sudden avulsion, and that it is therefore a part of the state of Nebraska and plaintiff is not entitled to a decree quieting his title.

*Appeal from Harrison District Court.*—Hon. A. B. Thornell, Judge.

Saturday, April 12, 1913.

Suit in equity to quiet plaintiffs' title to lot No. 4 in section No. 7, township No. 79 north, range No. 45, in Harrison county, Iowa, being a fractional lot in the original government survey. Defendants claim that there is no longer any such lot; that the tract of ground in controversy is a part of

section No. 35, in township No. 2, range No. 11, in Washington county, Neb., being accreted land to said section No. 35 or to some of the lots therein. As originally surveyed, the land in controversy was on the Iowa side of the river; but it is now on the Nebraska side and there is no stream west thereof. The sole question in the case is whether or not said land was left intact; the river having changed its course during one of the humors for which it is noted. The trial court found that, while the river had changed its course, it did so gradually, washing away all the land in controversy and depositing it, or other soil, gradually and imperceptibly to and upon the land on the Nebraska side of the river. Plaintiffs appeal. —*Affirmed.*

*H. H. Roadifer* and *T. J. Mahoney,* for appellants.

*S. H. Cochran,* for appellees.

DEEMER, J.—While defendants pleaded a former adjudication of this controversy in *Quinlin v. Bratley,* 80 N. W. 405, they do not now rely upon that case as an adjudication, but contend that the lands involved in that controversy were in the same section and immediately south of the lot now claimed by plaintiffs, and that the change in the course of the river, which washed away the land claimed by Quinlin in that case, was the same change which affected the land that is the subject of this controversy. An examination of the records in the two cases shows that this contention is true; and while there is no privity of title or estate in the parties to this litigation, so that the decree in the *Quinlin* case would be an adjudication here, the fact that it involved the same change in the course of the Missouri river should doubtless be taken into account, except in so far as the record in this case differs from the one in that.

Again, while defendants in this case pleaded the statute of limitations and adverse possession, they announced in the

district court, that they did not rely thereon and make no such claims on this appeal. The sole question in this case is one of fact, and that is whether or not the land in controversy is west of the river and a part of the land in Washington county, Neb., due to gradual erosion, or whether the river changed its course by a sudden avulsion, leaving the land still in Iowa, although the river be now flowing east thereof. If the former, then plaintiffs cannot recover. If the latter, then they are entitled to a decree quieting their title to the lot which they claim, and perhaps to some land accreted thereto.

Plaintiffs must recover upon the strength of their own title and not upon any weakness of that of their adversaries; but, the land now being on the west, or Nebraska, side of the river, it may be that plaintiffs have the burden of showing that the change in the course of the river, which left it there, was of such a character as not to destroy its identity, and that this change was, in common vernacular, a "cut-off" or an avulsion, rather than a gradual washing away and cutting into the Iowa shore; in other words, erosion. But, no matter where the burden as to the nature of this change, it is conceded on all sides that the land is now on the Nebraska side of the river and apparently a part of the territory within that state. Plaintiffs concede that all of fractional lot No. 3 which originally abutted upon lot No. 4 to the north, was gradually washed away by the river, and that a part of lot No. 4 was also gradually washed away; but they also contend and offered testimony to show that the remaining part of lot No. 4 always remained intact, undisturbed, and subject to identification. They introduced one witness, who gave direct testimony to that effect; but he was an interested one, having one time owned and conveyed the lot, and it does not appear that he was more than occasionally upon the land prior to the year 1891. Again, this witness conveyed the same land, by warranty deed, in the year 1896, describing it by metes and bounds and as being in the state of Nebraska. Defendants introduced several witnesses who lived near the land in con-

troversy and who watched the changes of the river from about the year 1867 down to near the time of the trial of this case in the district court. These witnesses all testify that the river commenced cutting in the Iowa side and adding to the land on the Nebraska side; that it "turned the land all over"; that it left no islands and never ran around any body of land as claimed by the plaintiffs' witness.

The preponderance of the direct testimony is with the appellees. For appellants it is contended, however, that, aside from this direct testimony, there is other evidence of physical conditions and facts which corroborates the direct testimony and demonstrates that the river could not have washed over the entire lot in controversy; and that it must, during its change, have passed around part of it, leaving some of it still in Iowa, and drawing to it accretions to the west, at least as far as the west bank of the river as originally meandered by the government surveyors at the time of the survey of the state of Nebraska. They rely upon certain levels taken just before the trial, which show portions of the original lot No. 4 to be twelve inches higher than any of the highest points along the old west bank of the river.

Reliance is placed upon the fact that stumps are now standing on the northeast portion of lot No. 4, although much decayed, which must be more than sixty years of age, indicating that this land was never washed away. It is also claimed that the river passed some distance east of its present channel some time about the year 1892, and that since that time it has been gradually working westward again, and that there is now a well-defined bank, as of a river, to the east of what was lot No. 4 on the Iowa side, indicating that, when it made its change, it must have passed around a part of lot No. 4, following what is now called a "chute," making new banks on both sides of the stream. Moreover, plaintiffs introduced testimony to show that, where the stumps of the old trees were found, there were two kinds of soil, one described as

loose clay, something like eighteen inches in depth, and below that a hard black soil.

An expert who looked at these stumps testified that it would take about thirty years for the largest one to grow, and he further said that they were all of cottonwood, the largest being twenty-nine inches in diameter, and that he thought the trees had been felled more than eight years before he examined them. This same witness, using some hypothesis, gave it as his opinion that some of the trees, whose stumps he found, had been growing close to sixty years. The net effect claimed for this testimony is that the finding of the stumps indicates that the trees were growing upon lot 4 as much as fifty or sixty years ago in the black soil found something like eighteen inches below the present surface, and that this soil has never been disturbed, indicating that the river must· have cut around part of this lot 4 rather than cut through it by erosion. Much of this latter testimony is speculative· in character and should not be allowed to control over direct and positive testimony.

From the records heretofore before this court, from general knowledge as to the vagaries of the Missouri river, and from facts known by all who have had anything to do with the changes of the channel of that stream, too much dependence cannot be placed upon mere theories. Cottonwoods, willows, and other quick-growing trees spring up along that stream and grow to great size in a few years, and upon lands which were at one time within the channel of the river will be found trees large in size, apparently so large as to indicate that the river passed over the ground long years ago. Yet the testimony shows that these trees are of very rapid growth; that they spring up as soon as the water recedes, and in a short time look as if they had always existed there. Indeed, this record shows that the largest tree could not have been more than thirty years old at the time the witnesses gave their testimony, which was in the year 1911. Accepting this as a fact, the trees did not begin to grow until the year 1881,

and this corroborates defendants' theory of the case. But appellant says that some of the stumps were covered by soil washed in about them, and that some were several inches above the soil, indicating that the latter were of trees growing after the first were cut. This, too, is a speculation rather inconclusive in character.

It is well to know that the soil in this Missouri bottom, after it has been turned over by the river and becomes dry again, is as shifting as the sands, and drifts with the action of the winds. Again, the river itself carries a great amount of sediment and silt, and, when it overflows its banks, large deposits are made wherever there is any obstruction to its free flow. It cannot be said just how long this sediment, which it is claimed was on top of the black soil, was in forming. It may have been but a single season. Again, the finding of some of these stumps in apparently black soil is inconclusive in character. After the river recedes and vegetation and trees spring up and humus enters the soil, it becomes black or brown and hard and firm, and, were it not for the sub-soil, it might withstand the ravages of the river.

Assuming that the change in the river occurred some time in the year 1881, which is conceded by every one, it is apparent that the large stump must be of a tree which was not growing when that change was made. The theory that the other stumps were of trees which had been cut off before the larger began to grow is not sustained by the testimony. At most, it is a mere surmise, arising from physical facts, which are subject to another explanation. If this contention be true, then these stumps have been in the ground, where they now are, for thirty years, yet still preserve their shape and, although rotted, enough of their consistency to indicate their age.

The testimony shows in this case, and it is a well-known fact, that cottonwood stumps will not last for that length of time. According to the record before us, such stumps and the roots thereof will not last more than seven or eight years after being cut. It is manifest that the tree theory is not persuasive.

Again, there is direct testimony to the effect that no such trees were growing upon the land thirty years ago, as the opinion of the expert would indicate. A witness entirely familiar with the situation, and who could look out of his door and see the entire situation, said that there were no trees upon the land, except those which sprang up since the change in the channel of the river. The differences in the levels taken may easily be accounted for, as already indicated. It is nothing unusual to find the banks of a river higher than the surrounding land; and land which may have, at one time, been washed over by the river may become higher than some which, at one time, was a bank of the same stream.

The preponderance of the direct testimony is with the defendants, and the theories upon which plaintiffs rely in support of their direct evidence are not inconsistent with the claims made for defendants. Indeed, some of them tend to support the defendants' theory of the case.

The trial court found that plaintiffs had not made out their case by the quantity of proof required, and with that conclusion we agree. The decree must therefore be, and it is, *Affirmed*.