JOHN A. HEISLER and JOHN A. HEISLER, TRUSTEE, Appellant,
v. THE METHODIST PROTESTANT CHURCH OF MAPLETON,
IOWA, Appellee.

**Charities:** CONTRIBUTIONS: PROPERTY RIGHTS: TITLE. A voluntary and
1    unconditional contribution to a church society for the purpose of
acquiring and improving property for the use and benefit of the
society, does not create an express or resulting trust in favor of
the donor upon disuse of the property by the society, although
he may have been the largest but not sole contributor.

**Same:** One making an unconditional voluntary contribution to a
2    church society will be presumed to have done so with a law of the
denomination in view, which provided that upon dissolution of the
local organization its property would pass to the denomination of
which it was a part, and the donors cannot recover the property.

**Same:** QUIETING TITLE: CONVEYANCES. Where the property of a local
3    church society passed by the law of the denomination to the govern-
ing body of the denomination upon dissolution of the local society,
quit claim deeds by trustees of the local society conveying the prop-
erty to the denomination were not material in an equitable action
by donors to recover the same; as the plaintiff must recover on the
strength of his own title, if at all.

**Same:** LIMITATION OF ACTIONS. A member of a religious society cannot
4    require the society to rely upon the statute of limitations for the
purpose of defeating an honest debt.

*Appeal from Monona District Court.*—HON. WILLIAM HUTCH-
INSON, Judge.

SATURDAY, JUNE 20, 1914.

ACTION in equity to set aside certain deeds and for other
relief. Petition dismissed, and plaintiff appeals. The nature
of the issues joined and the material facts are stated in the
opinion.—*Affirmed.*

*C. R. Metcalfe,* for appellant.

*Miles W. Newby* and *T. B. Lutz,* for appellee.

WEAVER, J.—There is very little dispute over the material facts in this case. A church of the Methodist Protestant faith was organized and incorporated at Mapleton, Iowa, in the year 1893. About that time it purchased a lot and erected thereon a house of worship. In aid of such enterprise the church borrowed $300 of the Board of Church Extension of the Methodist Protestant Conference of Iowa, securing the indebtedness so contracted by mortgage. Several years later, feeling the need of a parsonage, a movement was inaugurated to build one. A subscription was taken to the amount of several hundred dollars, but not for sufficient amount for the entire expense contemplated. The plaintiff, a member of the church and a man of considerable means, advanced $80 for the purchase of a parsonage lot, the title to which he caused to be conveyed to the church or its trustees for the use of the church. The plaintiff also undertook to guarantee the bills of the church for materials and labor, and in so far as the sum raised by subscription fell short of the cost of the parsonage improvements he paid the indebtedness so contracted. The church and its successive pastors occupied and used the property as a parsonage for about six years, when by reason of dissension in the membership and lack of financial support it abandoned religious services and became disorganized. Under a rule or law of the Methodist Protestant denomination the property of a local church which becomes extinct or too weak to maintain appropriate church services becomes vested in the Conference of that faith, subject to the debts of the local organization, and the fund so arising is used and applied in aid of the building of other churches. This work is committed to the Board of Church Extension, already mentioned, which is a subsidiary of the Conference. In the year 1906, when it became apparent that the church must be aban-

doned, an officer of said board came to that place and had a meeting with the trustees and leading members of the local society concerning the matter of the church property. The plaintiff was present at the meeting. While the details of this consultation are not shown with any completeness, it sufficiently appears that all parties understood and acted upon the theory that the property passed to the Conference or its Board of Church Extension, and the subject of negotiation was largely upon the matter of the indebtedness of the church. The mortgage debt to the board was still unpaid, and one of the recent pastors held an unpaid claim of $125 for salary. It was finally agreed that the board should assume payment of these claims, and the possession of the property should be surrendered to it. In consummation of the transactions Mr. Metcalfe, an attorney and member of the church, was made an agent to care for and lease the property on account of the Board of Church Extension. This status of affairs continued for about four years without objection on the part of any one, when in 1910 some negotiation took place between the plaintiff and the board, or some of its officers, looking to the purchase by plaintiff of both church and parsonage for the sum of $1,000. About the same time the defendant Carhart, also a member of the church, proposed to buy the property, and offered $1,250 for it, and this offer was accepted. With the thought that the record title would thereby be improved, the trustees who were serving the church at the time it became dormant, or as many of them as could be found, quitclaimed the entire property to the Board of Church Extension, and thereafter the board in turn quitclaimed to Carhart. At some stage of this transaction the plaintiff brought an action in the district court against the board, pleading an alleged agreement to sell the property to him for $1,000, and asking that such agreement be specifically enforced. He also asked that the board be enjoined from making the sale to Carhart. What became of that action is not clearly shown but we may safely assume that it was withdrawn or dismissed without final

adjudication, and this proceeding instituted in its stead. In this action plaintiff seems to sue in the double capacity of a former trustee or member of the local church and also for the quieting of the title to the parsonage lot in himself individually. As to the church building and lot, it is his claim that when the church became disorganized the property reverted to the original donors, and he demands a decree ordering its sale and a distribution of the proceeds so arising among the persons contributing to its purchase and improvement. Concerning the parsonage property, he takes the position that, as he advanced the purchase price of the lot and paid a large share of the cost of the improvements thereon, the title reverts to him individually, and he demands a decree confirming such claim and awarding him the possession, and for other relief, including the cancellation of the quitclaim deeds heretofore mentioned. The defendants take the position that plaintiff has no right or interest in the premises entitling him to question the title conveyed to Carhart by the Board of Church Extension. They further deny that under the facts as pleaded, or under the evidence as produced on the trial, there was or could have been any reversion of the church property to the individuals contributing to its procurement, or of the parsonage property to the plaintiff. The district court, after hearing the evidence, dismissed the bill.

Counsel for appellant, with commendable industry, has gathered for our consideration many precedents, to the effect that at common law where property has been given for the

1. CHARITIES: contributions: property rights: title.

promotion of a charitable or religious enterprise, and that enterprise fails or is abandoned and the gift is no longer used for its intended purpose, it reverts to the donor. The soundness of the general rule as stated in the cited authorities may be conceded for the purposes of this case, but we are quite well satisfied that plaintiff's own version of the facts does not call for its application. Turning, first, to the claim set up by him to the parsonage lot, he expressly admits as a witness that the

money contributed by him for this property and for its improvement was a voluntary and unconditional contribution to the church; that he knew for four years that the Board of Church Extension was claiming title to the property and exercising acts of ownership over it; that he proposed to purchase it from the board, and was ready and willing to pay the board $1,000 for it at the time this action was begun; and that by action in court he sought to enforce such alleged agreement of purchase. Indeed it is doing plaintiff no injustice to say that the thought that he had any title or rights of ownership in this property did not enter his mind for four years after it had been surrendered to the board (certainly he asserted no such right) until he found that Carhart had raised his offer to purchase. In other words, the controversy in its inception was not over any alleged want of title in the board, but over the question whether the board should sell to plaintiff for $1,000 what Carhart was willing to buy and did buy for $1,250.

Nor does the evidence bear out plaintiff's claim that he was the sole donor of the funds used in buying the parsonage lot and erecting the parsonage, though he was undoubtedly the most liberal individual contributor. There is evidence tending to show that the total expense thus incurred was in the neighborhood of $1,000, and that of this sum about $600 was raised by general subscription. But in any event he concedes, as we have already said, that what he paid and contributed to the parsonage enterprise was a voluntary and unconditional gift on his part for the benefit of the church. There was, therefore neither an express or resulting trust in his favor so far as the original transaction is concerned.

Nor can we see that the disbanding of the local church worked any change in plaintiff's relation with respect to the property. When he became a member of the church and contributed of his means in promotion of the effort to provide a parsonage without attaching any condition to such gift, he must be held to have made

2. SAME.

it in contemplation of the law of the church by which, upon abandonment or dissolution of the local organization, its property, including the parsonage, would pass to the Conference or its Board of Church Extension. In other words, the charitable or religious purpose for the promotion of which he gave his money did not terminate or fail with the failure of the local society to maintain its organization. It survives in the general church of which that society was but one component part, and in the charitable and religious work in the performance of which that denomination and its organized agencies continue to be engaged. It follows here, also, that no trust resulted in plaintiff's favor.

The rule which we have here affirmed is equally applicable to the claim made by plaintiff as a member of the church that the property other than the parsonage should be sold and the proceeds of such sale divided among the original donors. Plaintiff himself was not then a member of the church, nor does it appear that he was a contributor thereto until a later period. So far as the record before us indicates, there is nothing whatever showing who were the donors of that property, or who contributed to its purchase, and, so far as we can know, no one entitled thereto is asking or desiring such relief. But as we have just said, even if any of the donors were in court demanding such relief, we should have to say to them, as we say to the plaintiff, that the purpose for which they gave their money has not failed, and their demand must be denied.

It is argued that the quitclaim deed to the Board of Church Extension and by the board to Carhart must be set aside because of a law or rule of the church which forbids a 3. SAME: quieting title: conveyances. sale or transfer of the church property except upon consent or vote of a majority of the membership. To this it may be answered that the trustees did not sell or dispose of the property. The local church held the property by a title which would pass, in a certain contingency, to the Conference or Board of Church

Extension.   That contingency occurred, and for a period of
four years all parties in interest acquiesced in the control
and claim of ownership on the part of the board.   The title
of the board as against the local church and its members was
complete without any formal conveyance and the subsequent
execution or delivery of the quitclaim deed had no effect what-
ever, unless it be to make of record evidence of a title already
fully vested.   Whether it be of any value for that purpose
we need not consider.   The plaintiff is in no position to ques-
tion it.   It is immaterial that we consider the validity of the
title by which Carhart owns or claims the property.   Plain-
tiff must recover or be awarded relief, if at all, on the strength
of his own right or title, and if he have none, it is unneces-
sary for the court to pursue the inquiry further.

So, also, it is argued that the mortgage debt of $300 of
which the board relieved the local church in taking over the
property was barred by the statute of limitations.   We are
4. SAME: limita-   at a loss, however, to understand in what man-
tion of actions.   ner that fact, if it be a fact, affects the rights
of the parties to this litigation, or the question whether the title
passed to the board upon the disbanding of the local society.
No right is asserted in this action to enforce the debt or the
mortgage securing it.   In any event, there is no law by which
a member of a church may compel the religious corporation of
which he is a member to hide behind the statute of limitations
to escape the payment of an admittedly honest debt.   A plea
of such character is sometimes upheld in an individual seeking
to escape liability for his own debt, but no court has gone to
the extent of holding that he can insist upon another person
pleading the statute for his individual benefit.   The question
thus raised has no relevancy to the controversy we are called
upon to decide.   It required no new consideration to effect or
sustain the passing or vesting of the title in the defendant
board.   On no conceivable construction of the conceded facts
can the relief demanded by plaintiff be granted.

The cases directly in point with the one before us are

few, but the principle to which we adhere seems to be fundamentally sound. See *First Methodist Protestant Church's Appeal*, 16 Weekly Notes Cas. (Pa.) 245; *Jones v. Renshaw*, 130 Pa. 327 (18 Atl. 651).

The conclusions we have announced are decisive of the controversy. The decree of the district court is—*Affirmed*.

LADD, C. J., and EVANS and PRESTON, JJ., concurring.