CITY OF DUBUQUE et al., Appellants, v. FISCHER & COMPANY, INC., Appellee.

CITY OF DUBUQUE et al., Appellants, v. FISCHER INVESTMENT COMPANY, Appellee.

No. 41505.

DECEMBER 13, 1932.

M. H. Czizek, for appellants.

Brown, Lacy & Clewell and Frantzen, Gilloon & Glenn, for appellee.

ALBERT, J.—Separate actions were brought by the plaintiff against Fischer & Company, Incorporated, and the Fischer Investment Company. The actions were consolidated and are disposed of in this court as one case. The reason for the two suits was that the respective defendants owned different pieces of property involved in the litigation.

The historic background of this litigation is as follows: On July 2, 1836, the Congress of the United States enacted an act "laying out the town of Dubuque," etc., which provided that the Surveyor General of Public Lands should make a survey and lay out the town into lots. streets, avenues and public squares.

At that time, what is now the state of Iowa was a part of the territory of Wisconsin, and on December 6, 1836, the territorial legislature incorporated the inhabitants of that town into a municipal corporation. The survey and plat of said town were filed for record November 1, 1838. The town thus laid out was wholly on the mainland, and east thereof were a number of islands divided from the mainland by sloughs. The city desired these islands, and by an act of Congress they were granted to the city, and a patent was issued by President James K. Polk on February 1, 1848, conveying one of the islands in section 30, containing 85.47 acres, and on May 4, 1852, President Fillmore, by the same act of Congress, issued a patent to the city on lot 1 of section 30, lot 6 in section 25, containing 45.16 acres, the total area of the islands being 130.63 acres.

In 1853, by an act of the legislature of the state of Iowa, the north and south boundaries of the city of Dubuque were extended to the middle of the channel of the Mississippi River; thus the islands became a part of the property of the city of Dubuque. Efforts were then made to extend the streets of the original city across these islands and to fill certain parts thereof, and directing construction of such bridges as were necessary to thus extend the streets. The territory thus added on the east side of the city of Dubuque was divided east and west into three sections, and the north of said three sections was contracted away on March 3, 1855,

to Longworthy and others. The Longworthy contract went to a corporation known as the Dubuque Harbor Improvement Company. This contract, and the deed subsequently issued in pursuance thereof, excepted a strip 100 feet wide on the east side thereof for levee purposes, and also provided that the contractees were to construct a levee thereon. The land covered by this contract is not involved in this action.

On April 24, 1856, the city of Dubuque made a loan from one Corcoran of $100,000, and to secure the same executed a mortgage on "all the islands and parts of islands patented to said city by the United States which lie within the limits of the main channel of the Mississippi River, save and except therefrom such parts thereof as have been already conveyed or contracted to be conveyed." Said tracts of land herein conveyed are more particularly described as follows:

"All that part of lot six of section twenty-five, etc., which lies north of Waples Cut; lot 1 of section 19; all that part of lots 2, 3 and 8 of section 19 which lies north of the lands conveyed or contracted to be conveyed to the Dubuque Harbor Improvement Company; all that part of lot 1 of section 30 as shown upon said plat, which lies between the Waples Cut and the original Barney Cut, and all that part of lot 2 of said section 30 * * * which lies south of the continuance of the original Barney Cut across the outer island to the main channel of the Mississippi River as shown upon the map of Dubuque by * * * the said James Potter's plat of the city furnished said Corcoran, together with all and singular the improvements and appurtenances thereunto belonging."

This mortgage was duly foreclosed on October 1, 1867, and a commissioner's deed was duly executed to Henry L. Stout on May 26, 1868. It is to be noted at this point that the Corcoran mortgage had no exceptions or reservations whatever, so far as the land under consideration in this case was concerned.

A contract and deed were also made by the city to the south section of said territory to another company known as the Dubuque Harbor Company. This deed also reserved 150 feet along the water front.

On January 20, 1857, the city made a contract with one Farley and others for all of the territory lying between that granted to the Dubuque Harbor Improvement Company on the north and that

formerly granted to the Dubuque Harbor Improvement Company on the south, and the land lying in this center territory involves the land in controversy. In this grant the deed by the city to the Dubuque Central Improvement Company, the successor to Farley, a reservation was made of 150 feet along the whole waterfront on the east of said territory. This land was deeded to the Dubuque Central Improvement Company on June 1, 1857.

It is to be noted at this point that the contract with Farley and the deed for said territory were made subsequent to the Corcoran mortgage which had been duly recorded. Each of these three different territories was in time platted with streets, alleys and blocks.

The record shows that the Waples Cut was on the boundary between the property owned by the Dubuque Harbor Improvement Company on the north and that of the Dubuque Central Island Improvement Addition, and the Barney Cut was on the line between the last-named company property and the Dubuque Harbor Company's territory.

On October 29, 1873, this central territory was conveyed by tax deed by the treasurer of Dubuque county to J. H. Stout, said deed describing the property as "islands between Waples Cut and Barney Cut."

On April 5, 1876, J. H. Stout and wife executed to H. L. Stout a quitclaim deed for the same territory. In the intermediate time, this territory had been duly lotted and platted.

On April 20, 1887, Henry L. Stout, unmarried, made a special warranty deed to C. H. Booth, conveying to him, among other property, blocks M, N and O in Booth's Addition to the City of Dubuque, according to plat. This territory was later platted and known as "Booth's Addition."

On October 2, 1895, C. H. Booth conveyed, by warranty deed, to Caroline Fischer, lots 8, 9, 10 and 11, and so much of lot 7 lying northerly of the railroad track running over the southern portion of said lot, said portion of said lot being the northerly 19 feet and 9 inches, all in block M of Booth's Addition to the City of Dubuque.

In May, 1904, the heirs of C. H. Booth conveyed, by warranty deed, to Caroline Fischer lots 1 to 11 inclusive in Block N and lots 1 to 5 inclusive in Block O in Booth's Addition.

The property described in the last two deeds lies on the east side of the island, and this litigation is over a strip of land lying

between the Fischer property and the east waterfront of the island. Of these three blocks, M is the southerly and O the northerly, and N lies between the two. When the Fischers acquired this property in blocks M, N, and O, they constructed various buildings thereon, carrying on their business of furnishing ice to the city of Dubuque. Later they constructed on the northern part of the property an artificial plant, and natural ice was taken from the adjoining waters of the Mississippi River. Between the east line of these lots and the shore of the river, a railroad company had constructed a track under an ordinance of the City. This railroad was on the 150-foot strip which is in dispute in this litigation. With the exception of a short distance along the south part of block M, no levee had been constructed east of the Fischer property. The land along there seems to have been low and swampy, and the railroad, as originally constructed, was carried on piling. On acquiring this property, the Fischers constructed a stone wall to the east of the railroad track and commenced to fill in between their property and this stone wall. The cost of this filling was about $8,000. They constructed an underground sewerage line from their artificial ice plant across this strip of land to the river. They also constructed an overhead ice chute or slide and a chip conveyer to be used in connection therewith on trestle work, for the purpose of conveying natural ice from the river to the ice house; also, a coal pit was built from their building under the railroad track for the purpose of receiving coal from the railroad company and conveying the same into their plant, and a coal shed was also built for use in connection with their business on the strip of land in controversy.

The agreement and deed between the city of Dubuque and Farley, among other things, after conveying the property between that of the Dubuque Improvement Company and the Dubuque Harbor Company, further recited:

"The said property being subject to all public uses and easements now pertaining to, and incumbent on said property; also, saving and reserving to the said party of the first part a levee 150 feet wide from low water mark the whole length of the front of said property, on the said main channel of said river; also, saving and reserving to said party of the first part the exclusive right to establish, regulate and collect wharfage upon any part of the property, hereby sold and conveyed."

The provision reserving the 150-foot strip was a part of all the contracts and deeds made by the city with these various parties, except there was no such reservation in the Corcoran mortgage.

Generally stated, these are the salient facts involved in this litigation. The contention of the city is that because of these reservations in the deeds and contracts, the city has been and now is the owner of this strip of land 150 feet wide. They state, in terms, that there is no question of dedication by reason of the platting of these various territories, and the plats showing the land in controversy to be marked "levees." The plaintiff's action is to quiet title to this strip of land. Defendant's answer sets up matters claimed to defeat the plaintiff's right, but does not cross-petition and ask that title be quieted in it.

The burden of proof, therefore, is upon the plaintiff to sustain the allegations of its petition, and it is fundamental law that one occupying such a position must recover on the strength of his own title, and not upon a weakness of the defendant's. Empire Real Estate & Mortgage Co. v. Beechley, 137 Iowa 7; Hafner v. Chase, 146 Iowa 231; Morrow v. Mutz, 159 Iowa 652; Heisler v. M. E. Church, 166 Iowa 333; Dwight v. City of Des Moines, 174 Iowa 178.

The plaintiff bottoms its right of recovery solely upon the proposition that this strip was reserved to the city and it has never parted title therewith, and it seeks to avoid the force and effect of the mortgage foreclosure by a claim that the levee provided for in these various deeds and contracts was to be "in front" of the property. It argues, therefore, that it was not to be a levee on the island, but "in front" of it; hence, when the conveyance was made in the mortgage, it did not convey this strip of land. The words "in front" are not used in any of the contracts or deeds, and the description in the mortgage conveys the island as deeded by the United States government, which, of course,—there being no other reservations or specifications therein,—would carry the land to the low-water mark.

The plaintiff argues that, the levee being "in front" of the island, it is therefore not on the island, and hence not covered by the mortgage. This is a false premise. The title to the island as patented by the United States government ran to high-water mark, the Mississippi River being a navigable stream, and the Corcoran

mortgage purported to cover the identical territory which the city received under its patent from the United States government. Therefore, whatever title the city had in this territory was fully covered by the Corcoran mortgage. By reference to the chronology heretofore set out it will be seen that, so far as the land in controversy is concerned, the Corcoran mortgage was executed before the Farley contract; hence any reservation in the Farley contract could not affect the provisions of the Corcoran mortgage, and the city lost all title and right to this strip of land by the foreclosure proceedings. There is nothing in the record to show that subsequent to the foreclosure proceedings, it acquired title to this strip of land. The title being in other parties, the city could not acquire such title by its subsequent contracts and deeds in which the strip of land was reserved.

The city does not claim to have acquired any right in said property by reason of adverse possession of the same, but bottoms its right, as above suggested, wholly on the proposition that it never lost title to this strip of land. This being the sole claim of the plaintiff, and having reached the conclusion that the mortgage foreclosure deprived the city of all its rights in this property, and giving plaintiff the full benefit of the facts in the record, we can not see where the plaintiff has, by a preponderance of the evidence, sustained its cause of action.

Elaborate briefs are filed and much argument is devoted to the question of the weakness of the defendants' title to this property, but with this phase of the question we are not interested, because it is our conclusion, after a careful study of the record, that plaintiff has failed to establish such facts and make such a showing of strength of title on its part as would entitle it to recover. In fact, under the record as presented here, plaintiff has failed to show it has such required strength of title, and in fact, has failed to show that it has any title to the property in controversy. It necessarily follows, therefore, that the action of the district court in dismissing plaintiff's petition in each case was right.—Affirmed.

STEVENS, C. J., and EVANS, DE GRAFF, and KINDIG, JJ., concur.