**W. B. JEFFREY, Appellee,**

**v.**

**Ray L. GROSVENOR and Grace H. Grosvenor. (Appellants) Woodbury County, Iowa; and all Unknown Claimants, and all Persons Unknown Claiming any Right, Title or Interest in and to the Following Described Real Estate, to-wit: Lot One (1), of Section Thirty-Four (34), Township Eighty-Six (86), Range Forty-Seven (47), Woodbury County, Iowa, together with all accretion lands appurtenant to and thereto belonging and all rights of accretion belonging to said premises; and all the Heirs, Spouses, Assigns, Grantees, Legatees, Devisees and Beneficiaries of each and all of the above named defendants. (Defendants)**

No. 52875.

Supreme Court of Iowa.

March 5, 1968.

Prichard & Prichard, Onawa, for appellants Ray L. Grosvenor and Grace H. Grosvenor.

Richard W. Beebe and Edward F. Samore, Sioux City, for appellee.

SNELL, Justice.

This is an action to quiet title to Lot 1 of section 34, township 86, range 47, Woodbury County, Iowa. The tract contains 37.55 acres and is what is commonly called Missouri river bottom land. We have had many cases involving such land.

We hope that ultimate victory of the Corps of Army Engineers over a stubborn and powerful antagonist, i. e. the Missouri river, will make possible the stabilizing of titles and the diminution of such controversies.

In Sieck v. Godsey, 254 Iowa 624, 625, 118 N.W.2d 555, Mr. Justice Thompson commented:

"This case comes to us by courtesy of the Missouri River and the United States Corps of Army Engineers. The engineers have been for many years engaged in an attempt to enforce some measure of law and order upon this most wandering and capricious of rivers; and in the course of their activities has arisen the situation which gives rise to the present lawsuit."

In State v. Raymond, 254 Iowa 828, 829, 119 N.W.2d 135, we said:

"Stabilization of the Missouri River channel between Sioux City and Omaha by the United States Corps of Engineers has caused many legal problems to be brought to our attention. This is another such case."

In Dartmouth College v. Rose, 257 Iowa 533, 535, 133 N.W.2d 687, 689, we said:

"The rules applicable to questions of accretion and title to land so formed have frequently been analyzed by us and need little review here. The parties are not in disagreement over the legal propositions involved. We state some of them briefly."

The case now before us arose because of a change and stabilization of the river channel to the west with the result that what was formerly of little or no value may now be made useful and valuable.

The trial court commented:

"This is another of many cases reaching the Iowa courts involving the title and rights of owners to land in what is commonly referred to as the 'Missouri river bottoms.' These disputes have arisen due to the former proclivity of the river to wander back and forth in a generally easterly and westerly direction, forming new channels and leaving in its wake an assortment of quarrels as to the ownership of land adjacent to it. Because of the number of these disputes which have reached our Supreme Court, the law applicable to them is well settled. As is so often the case, it is the application of this law to the facts involved which raises the more difficult problems here."

There is one plaintiff and many defendants, known and unknown. The real defendant is Ray L. Grosvenor who claims ownership. Reference will be to him as the defendant.

I. We have had before us maps, survey records and determinations showing the meandering of the river in this territory since 1852.

In 1937 land located south and west of the tract here involved, but within the same river loops, was the subject of litigation in the United States Courts. See United States v. Flower et al., District Court of the United States, District of Nebraska, Omaha Division, #1332 Equity, transferred to Law Docket, affirmed on appeal in 108 F.2d 298.

While the case did not involve the same land as here many of the same maps, exhibits, witnesses and river changes appear.

Lot 1, the tract involved here, is adjacent to Lot A owned by plaintiff. The trial court found that Lot 1 formed by accretion to Lot A and quieted title in plaintiff. We affirm.

To show the location of the tracts we reproduce Exhibit 29.

The river channel is now about 2 miles west with an inside chute and an outside chute, now dry, curving around to the east and then southwest. To illustrate the location of these chutes we reproduce a portion of Exhibit 39. This exhibit is a composite

map prepared by the United States Surveyors showing river channels as of 1852 to 1875 and 1890 to 1927.

PLAT Nº 4, INVESTIGATION OF WINNEBAGO INDIAN LANDS, GROUP Nº 56, NEBRASKA.

COMPOSITE MAP OF PLATS Nº 1, 2, & 3, SHOWING CHANNELS OF MISSOURI RIVER AS OF 1852 TO 1875, 1890 & 1927, AS AFFECTING STATUS OF LANDS IN

T. 26 N., R. 10 E., 6ᵀᴴ P. M., NEBRASKA.

The evidence shows and other decisions have found that at sometime in the past the river by its meandering eroded away Lot 1. Sometime between 1870 and 1879 and again in 1916 the river moved by avulsion to the west. The remaining chutes carried some water particularly during high water periods but gradually filled in.

Until a few years ago when a drainage ditch was completed Lot 1 was too wet to cultivate. It was covered with willows, small trees and coarse grass. It was not fenced. No one apparently knew where the lines were. When drained it could be cleared and farmed.

Defendant owned land to the south and west. His tenant, M. A. Small, farmed about 400 acres for defendant. He included part of Lot 1 in his operation, but testified he did not know what constituted Lot 1. Since 1961 it has been included in the A.S.C. Program as idle acres with payments collected by Small and defendant as a part of their whole program. Mr. Small also has had a written lease with plaintiff but has paid him no rent.

In 1954 Mr. Thomas Flewelling began clearing timber for defendant. He has cleared about 150 to 200 acres for defendant, including some work on Lot 1, but he did not know where the lot line was.

The following tabulation shows how plaintiff and defendant have exerted ownership over the land.

### Plaintiff

1. Plaintiff purchased Lot 1 from the devisees of one McAllister in 1941 when the land was thought to be of little value for $300.
2. Plaintiff holds record title to the land in dispute. (There is a strong presumption in Iowa that ownership is presumed from record title.)
3. Plaintiff has paid the taxes on the land for years, except in 1964 when the defendant paid the real estate tax.
4. Plaintiff has leases for the land for the years 1941–42; 1944–45; and a written lease to M. A. Small beginning in January 1964 and extending to the time of trial.
5. Plaintiff has never collected rent, but made unsuccessful efforts in 1952 to collect. There was doubt as to the source of the grain being sold.
6. A feed grain application dated February 17, 1966 has the names of Jeffrey and Small on it.

### Defendant

1. Defendant purchased "Flower Island" from Wilbert Flower and claims that the land in dispute is an accretion or an avulsion to Flower Island.
2. Defendant paid the real estate tax in 1964.
3. Defendant claims to have leased the land continuously since 1941.
4. Lot 1 was in the soil bank with other land for 4 or 5 years under name of defendant and M. A. Small.
5. Defendant has a written title opinion showing that defendant has marketable title to the adjoining land where corn was stored.
6. The defendant has collected rent from tenants.
7. Defendant's tenants have rarely been disturbed in operating the land.
8. Flower, predecessor in interest to defendant, leased Lot 1 from 1936–1939.
9. Defendant cleared part of the tract at his expense but no one knew where the line was.

II. The trial court made a careful analysis of the evidence from which we excerpt and adopt the following:

"It is undisputed in this case that the plaintiff has held record title to Lot 1 since receiving a warranty deed in 1942, from the heirs of J. H. McAllister, whose predecessors in turn held from government patent. A presumption of ownership follows the legal title and this is such a strong one that it can only be overcome by evidence which is clear, satisfactory and convincing. A preponderance of evidence is not sufficient. * * * The plaintiff therefore makes a prima facie case justifying the relief which he seeks by showing such legal title.

" * * *

"In order to reach the matters presented on this record it is necessary to briefly review the movements of the river in this locality over an extended period. * * * Many maps are in evidence * * *. The left bank of the river, as referred to on the maps and in the testimony, is that which is to the left of the observer looking downstream and, therefore, generally speaking, the left bank is the east side of the river and the right bank the west. In surveys made in 1852 and in 1875, the river was shown to be a considerable distance west of the land in controversy. By 1890, however, it had shifted to the east in a broad arc or loop so that its left or eastern bank had cut off the southwesterly corner of Lot 1. Thereafter, and sometime between 1890 and 1916, it moved somewhat farther to the east and north, forming what is referred to as a cut bank two to fifteen feet high * *. This cut bank was east of Lot 1 and the main channel of the river in 1916, was flowing against that bank, thus showing that all of Lot 1 had by this time been completely eroded and cut away. This cut bank marked the most easterly point to which the river progressed.

"In 1916 the main channel of the river started to move westward. * * * Eventually, * * * the river moved approximately two miles to the west of the land in controversy and its channel in 1927 is shown on Exhibit '39.' (reproduced supra) The exact nature of the movement of the river westward and just when it finally reached its 1927 channel is not shown by the record, probably because there were no surveys between 1890 and 1923.

"In its western progression after 1916, the river characteristically left what are described as the inside chute, which in 1927, was designated on Exhibit '39' as a highwater channel, and the outside chute which ran in a southwesterly direction near the west line of Lot A. This chute carried some water for some time. * * * By 1928, the outside chute * * * had fairly well filled with sand, and willows had grown up on a large portion of Lot 1 west of the chute, and willows and timbers had grown up on its east side, extending approximately halfway into Lot 1. * * * By 1930 the outside chute was completely filled * * *. But * * * in the spring and at flood-time, the river would come through this area. * * *

"What was the most easterly progression of the river up to 1916, as shown by the cut bank on the exhibits, and did this bank abut on or extend into Lot A? * * * The court concludes, * * * that the river did in fact progress to the westerly boundary of or into Lot A."

III. Defendant contends that the westerly movement of the river between 1916 and 1927 left a body of land or island between the two chutes and the 1927 bank of the river and that the accretion was to this land and not to the cut bank of the river on the east.

 The trial court said:

"An island in a river is a body of land emerging from the bed of the stream and completely surrounded by channels of the river. (Holman v. Hodges, 112 Iowa 74, [84 N.W. 950, 58 L.R.A. 673]; State v. Raymond, 254 Iowa 828, [119 N.W.2d 135].) When such an island emerges from

the bed of the river it becomes the property of the state. The area referred to does not in any way conform to the legal concept of an island so that claim can be made that the re-emergence of Lot 1 was by accretion to such an island. The chutes were not normal channels of the river but were just what they were termed by the witnesses, chutes.

"There was testimony in the record that the 1916 movement of the river was an avulsion and the defendants in their brief claim that this avulsion formed the area between the two chutes and the 1927 east or left bank of the river as an island, referred to as 'Flowers Island,' and that the land encompassed within the platted boundaries of Lot 1 accreted to such island."

To review all the evidence would unduly extend this opinion.

The trial court reviewed the evidence and then said:

"Under this record, therefore, we have no way of ascertaining what land is claimed to have existed prior to the 1916 shift which was cut off by the avulsion and remained identifiable thereafter. In order to permit the application of the principles of avulsion, two conditions must exist: (1) There must be a sudden shifting of the channel of the river, and (2) A body of land must be cut off so that after the shift it remains identifiable as land which existed before the change of the channel and which never became a part of the river bed. The second requirement is more important than the first. There can be a rapid change of the river channel with no cut off of land and the principles of erosion and accretion may still apply. It is only when land is cut off by such rapid change and remains identifiable that the principles of avulsion come into play. As has been pointed out, there is nothing in this record from which it can be determined that part of 'Flowers Island' to which it is claimed Lot 1 accreted, was identifiable land which was cut off by the sudden movement of the river so that the principles of avulsion

would apply to it. No surveys were taken and no witness testified to facts which would justify a finding with respect thereto, and any such finding could only rest upon speculation on the court's part."

The trial court's findings of fact said:

"1. The plaintiff is the owner of record title to Lot 1.

"2. Lot 1 was completely eroded by the action of the Missouri river so that in 1916, it was in the bed of the river.

"3. In 1916, the river commenced a movement towards the west of Lot 1.

"4. As the river retreated to the west and through subsequent action of the waters contiguous to Lot A, the area within the platted boundaries of Lot 1 re-formed as accretion to Lot A.

"5. The plaintiff was the owner of Lot A.

"6. The plaintiff is the owner of Lot 1."

IV. Defendant raised the issue of adverse possession.

For many years Lot 1 was of little value. It was too wet to farm. Both parties made claim thereto. Plaintiff had record title since 1941 and paid the taxes each year except in 1964. In that year plaintiff sent the money to pay but was told that the taxes had been paid.

The west line of Lot 1 was first established when surveyed in 1965. Defendant's tenant used part of the land in connection with defendant's adjoining land but did not know where the line was. The tenant had written leases from plaintiff and an oral lease from defendant.

There has been no such hostile, actual, open, exclusive and continuous possession, under claim of right or color of title, for at least ten years necessary to establish ownership in defendant by adverse possession. See Lawse v. Glaha, 253 Iowa 1040, 1046, 114 N.W.2d 900.

Defendant claims that plaintiff's right to quiet title is barred by laches. This claim was neither pleaded nor proved and need not be discussed.

V. The law relative to riparian rights acquired through accretion, reliction or avulsion is well settled. There is no need for extensive discussion. Brief mention will suffice.

Plaintiff must rely on the strength of his own title, and not upon a weakness of the defendants. City of Dubuque v. Fischer & Co., 215 Iowa 433, 438, 245 N.W. 758; Reuter v. Middlebrook, 257 Iowa 158, 162, 131 N.W.2d 817.

VI. The presumption of ownership which follows the legal title can be overcome only by evidence that is clear and convincing. A preponderance of the evidence is not sufficient. Wilcox v. Pinney, 250 Iowa 1378, 1381, 98 N.W.2d 720. The land involved in the cited case as shown on page 1382 of the Iowa report is north and west of the land now involved. The chutes shown are not the chutes involved in the case before us.

VII. To constitute an accretion there must be a gradual and imperceptible addition of soil to the shore line or adjoining land by the action of the water to which the land is contiguous. Wilcox v. Pinney, supra, loc. cit. 1383; Dartmouth College v. Rose, 257 Iowa 533, 536, 133 N.W.2d 687.

VIII. In Payne v. Hall, 192 Iowa 780, 783, 185 N.W. 912, 914, this appears:

"Meander lines are not boundary lines, but are only lines of survey, to determine the area included in irregular tracts bordering on navigable streams or lakes. Riparian owners along the banks of the Missouri River in Iowa hold title to the land to high-water mark, regardless of whether or not the same coincides with the meander line. McManus v. Carmichael, 3 Iowa 1; Houghton v. Railroad Co., 47 Iowa 370; Holman v. Hodges, 112 Iowa 714, 84 N.W. 950, 58 L.R.A. 673.

"The state of Iowa owns the title to the bed of the Missouri River from high-water mark to the center or thread of the stream. Iowa v. Illinois, 147 U.S. 1, 13 S.Ct. 239, 37 L.Ed. 55; Hardin v. Jordan, 140 U.S. 371, 11 S.Ct. 808, 35 L.Ed. 428; Holman v. Hodges, supra. If, by a slow and gradual process of erosion, the river washes away its banks and changes its course, the title of the state to the bed of the stream follows the course of the river in forming the new channel. If there is some avulsion of the stream, whereby it suddenly changes its channel in such a way as to cut off a body of land which still remains in such a condition that it can be identified, then the boundary lines of riparian property owners are not changed by such sudden avulsion or cut-off. Kitteridge v. Ritter, 172 Iowa 55, 151 N.W. 1097.

"Where lands are overflowed and submerged, and within a reasonable time the waters retire and the land reappears, the title of the owner is not disturbed, and the proprietorship remains in the original owner. Mulry v. Norton, 100 N.Y. 424, 3 N.E. 581; St. Louis v. Rutz, 138 U.S. 226, 11 S.Ct. 337, 34 L.Ed. 941; Ocean City Ass'n. v. Shriver, 64 N.J.Law, 550, 46 A. 690, 51 L.R.A. 425.

"This rule has also been recognized where lands are removed by erosion, and are restored by accretion after the river recedes. Allard v. Curran, 41 S.D. 73, 168 N.W. 761."

See also Dartmouth College v. Rose, supra, 257 Iowa loc. cit. 535, 133 N.W.2d 687.

IX. There is no issue of reliction before us.

This is an action in equity and as such it is triable de novo in this court. However, we give weight to the findings

of the trial court. See rule 344(f) 7, Rules of Civil Procedure.

Although not set forth herein we have given careful consideration to the entire record and the exhibits.

We are in accord with the findings and conclusions of the trial court.

The case is

Affirmed.

All Justices concur, except RAWLINGS, J., who takes no part.