Anthony L. **COSTELLO, Appellee,**

v.

Bernard **COSTELLO, Marie Sweeney, and Lawrence Costello, Appellants.**

No. 54433.

Supreme Court of Iowa.

May 5, 1971.

Charles E. Harris and Philip C. Lovrien, of Herrick, Langdon, Belin & Harris, Des Moines, for appellants.

James B. Smith, of Shirley, Smith & Shirley, Perry, for appellee.

RAWLINGS, Justice.

Plaintiff brought quiet title and partition action to which defendants filed answer and counterclaim. Trial court held adverse to defendants and they appeal. We reverse.

Anna F. Costello died June 29, 1967. All parties hereto are nieces, nephews and surviving beneficiaries under decedent's will.

Anna and her sister, Elizabeth, eccentric recluses, both unmarried, lived together in their Granger home for more than 35 years. Sometime in April 1966, they were taken to and remained in a hospital at Perry until removed to a nursing home at Woodward May 3, 1966. Anna was then 89. Elizabeth died there August 16, 1966. Prior thereto she and Anna each had an undivided one-half interest in a 69 acre farm, and the Granger home. Elizabeth

held title to another 69 acres. Anna alone owned a separate 23 acre tract.

Both sisters died testate. To the extent here relevant, each left the other, if surviving, a life estate in all of decedent's property, the remainder passing to plaintiff and defendants in equal shares.

The instant dispute stems from plaintiff's contention he acquired from Anna, by contract and deed, executed August 26, 1966, her undivided one-half interest in the 69 acre farm and all of the 23 acre tract. Defendants claim these instruments are void because of Anna's incompetency at the time they were signed.

In event the contract and deed are set aside, plaintiff and defendants will each own, by inheritance, an undivided one-fourth interest in all the land involved. Otherwise plaintiff will hold a five-eighths interest in the 69 acre farm, all of the 23 acre tract, and one-fourth of the Granger home.

A fair evaluation of this case leaves us no choice but to set forth a relatively comprehensive statement as to all trial testimony.

It discloses that about 8:00 the morning of August 26, 1966, plaintiff took Anna from the nursing home. They arrived at Edward Spellman's law office in Perry sometime between 8:30 and 9:00 A.M. There the controverted instruments were prepared, and shortly thereafter signed by Anna.

The fixed purchase price was $200 an acre or a total of $11,400, on which plaintiff promptly paid $500, the remainder a few days later, and the deed thereupon delivered.

In support of plaintiff's position he and four other witnesses testified.

The first was Sarah Sue Heins, secretary in the Spellman office. She stated Anna and plaintiff appeared there, both being present when the contract and deed were dictated. They then left, reappearing in about an hour and a half, at which time the instruments were signed. On each occasion Anna was apparently alert, spoke clearly in response to questions by Mr. Spellman, seemed to know what was being done, and said she wanted plaintiff to have the land.

Next called was Burton E. Poundstone, a licensed osteopathic surgeon. He attended Anna on three occasions between December 1965 and April 11, 1966. Though not then decedent's attending physician, this party went to the nursing home May 17, 1966, at plaintiff's request, for the specific purpose of observing and evaluating Anna's competency. Others present were plaintiff, Rev. John J. Gorman, and John Connolly III. They were there about a half an hour. Dr. Poundstone did not interrogate Anna but opined she was then competent and understood questions put to her by others. He also signed an affidavit to that effect and delivered it to Mr. Connolly.

Rev. John J. Gorman, third witness for plaintiff, stated Anna and Elizabeth were members of his parish at Granger. He had known the two sisters since 1936, and knew them to be conservative, exaggerative, and suspicious of others. Father Gorman visited these women at the hospital and nursing home. He was of the opinion Anna, as a general rule, knew what she was doing.

Plaintiff testified Anna went with him for a ride August 15, 1966. They visited a church in Granger and later drove past the "Costello home place", at which time plaintiff started talking about property owned by Anna. His subsequent testimony is to the effect she then expressed a desire to sell him all her land. As a result plaintiff contacted Mr. Spellman and arranged the August 26th appointment. On that date they went to the law office. Plaintiff was present during all ensuing discussions and heard Anna say she wanted $200 an acre. In plaintiff's opinion Anna was competent on August 26, 1966.

Attorney Spellman first reiterated much of his secretary's testimony. He also stated, while the contract and deed were being executed, Anna said, "When the rest of them hear about this there is going to be an awful spat, and I probably won't be here to help you." In the opinion of this witness Anna was fully competent when she signed the questioned documents. It developed, on cross-examination, Mr. Spellman is related to all parties involved in this case.

Nine people testified on behalf of defendants. First called was Joan Marie Lami, graduate nurse, regularly engaged at the nursing home while the two Costello sisters were there. Except for one week in June 1966, she cared for them daily, kept a corresponding record, and remembered both women were confused or disoriented most of the time. This witness testified in substance, while Anna was in the home, (1) she would wander into other patients' rooms, and even crawled into an empty bed in another room; (2) quite frequently wheeled the cart which each patient had, from which they ate their meals, up and down the hall going "Toot-Toot, anybody home?"; (3) was once found by an employee trying to physically get on top of the table, which was on wheels, and the nurse in attendance had to put it in another room; (4) she, Joan Lami, was raised around Granger, her mother was known to both Anna and Elizabeth, and this was explained to the sisters when they first came to the nursing home, but it did not appear to register with Anna; (5) although Joan Lami worked at the nursing home and saw Anna every day, the latter never called her by name, referring to "The one in white", once as "the one with the pointed cap who steals shoes"; (6) frequently accused others of stealing her property; (7) Anna was apparently unaware of the fact she was in a nursing home or even in Woodward; (8) on one occasion asked that Joan Lami take her to Woodward and when the nurse tried to orient Anna she replied, "Oh, I didn't know that." Finally this witness

stated, and the nursing home records reveal, Anna was "confused" August 26th when she left the hospital with plaintiff. In Mrs. Lami's opinion Anna could then neither have read nor understood any contract to sell her land.

Bernadine Elifrits, a co-owner of the nursing home, in regular attendance there, saw Anna every day and confirmed much of Mrs. Lami's testimony. Mrs. Elifrits also related that after Elizabeth's death Anna would look in other rooms for her sister, once put shoes on another lady and urged they go eat. In the opinion of this witness Anna was incompetent to transact any business.

Ray L. Schwartz, Executive Secretary of the Commission on the Aging, State of Iowa, resided in Woodward. He and his then wife owned an interest in the nursing home while Anna was there. Mr. Schwartz was at the home most every day, saw Anna frequently, noting her idiosyncrasies as related by Mrs. Lami and Mrs. Elifrits. This witness was of the opinion Anna was incompetent to transact business during any of the time he so observed her.

Anna Marie Sweeney, plaintiff's sister, a niece of Anna and Elizabeth, saw these sisters about three times a month the last eight or ten years of their lives. Mrs. Sweeney cared for her aunts, did some of their washing and bought clothes for them. While in the nursing home, however, Anna did not recognize her niece, often called her Dora, and would ask if she, in coming to the nursing home, drove a team and buggy. This witness was present on a few occasions when plaintiff arrived and Anna did not appear to recognize him. Mrs. Sweeney expressed the opinion Anna was incompetent to transact business any time from May 3 through August 26, 1966.

Lawrence F. Costello, one of plaintiff's brothers, related he called on Anna at the nursing home about once a month the summer of 1966, and four or five times thereafter prior to her death, but she never seemed to know him or his family. On

one occasion, after Elizabeth's funeral, Anna said, "There were some strangers came in this morning and got Lizzie and she had better get back pretty quick or Ma would take a stick and thrash her." Anna's mother had, at that point, been dead many years. This witness also deemed Anna incompetent from April 1966 to the time of her death more than a year later.

Bernard Costello, another of plaintiff's brothers, testified to the same effect.

Jacob C. Neff, formerly employed for 28 years in the farm investment department of a life insurance company, more recently an appraiser and farm manager, was a defendant called witness. In his opinion the 69 acre farm was worth $430 an acre, the smaller tract $200 an acre on the 26th day of August 1966.

John Connolly III stated he had served as attorney for Anna and Elizabeth, prepared their wills, acted for them under a power of attorney, and knew nothing of the instant transaction until much later when told of it by plaintiff only upon Mr. Connolly's inquiry.

Dr. R. F. Deranleau, a practicing physician at Perry, was the next witness. His testimony discloses he had served as general medical officer, having medical and psychiatric care of 2000 war veterans at the Veterans Administration Psychiatric Hospital in Sheridan, Wyoming, from 1946 to 1948. He was Anna and Elizabeth's attending doctor from April 1966 to the time of their respective deaths. When first examined by this practitioner Anna was very confused mentally and remained in that condition until date of her death. Dr. Deranleau also stated, "In my opinion she was definitely unable to take care of any of her affairs on August 26, 1966. She could sign a contract one day with somebody and I am sure if another fellow came along the next day she would sign another one and if a third one came around the following day she would do the same thing. It is my opinion that Anna Costello, on or about August 26, 1966, could not have understood the nature of the deed Exhibit 1, and it is my opinion that she could not understand what she was signing. He also said, "Well, in my opinion she was so incompetent mentally that she wouldn't realize what she was doing, whether it be a legal document or any other kind of a document, and I don't pretend to be a lawyer, but my medical opinion is that she was utterly incapable of doing anything to take care of her own affairs."

[redacted] I. Our review is de novo. Ia.R. Civ.P. 270, 275, 334, 344(f) (7); The Code 1966, Section 649.6; Baker v. Giffrow, 257 Iowa 929, 934, 135 N.W.2d 629; Jacobs v. Miller, 253 Iowa 213, 214, 111 N.W. 2d 673.

[redacted] It is also understood, plaintiff must rely on the strength of his own title, not on the weakness of that held by defendants. Jeffrey v. Grosvenor, 261 Iowa 1052, 1062, 157 N.W.2d 114.

II. The question posed is whether defendants established, by clear, satisfactory and convincing testimony, decedent did not possess sufficient consciousness or mentality, when the contract and deed were executed, to understand the import of her acts. In re Estate of Faris, 159 N.W.2d 417, 420 (Iowa); Stephenson v. Stephenson, 247 Iowa 785, 789, 74 N.W.2d 679; Leonard v. Leonard, 234 Iowa 421, 428, 12 N.W.2d 899. See 26 C.J.S. Deeds, § 54; 23 Am. Jur.2d, Deeds, § 46

As stated in Brewster v. Brewster, 194 Iowa 803, 808, 188 N.W. 672, 674:

> "If all of the evidence and the reasonable inferences therefrom lead to the conclusion that the grantor was incompetent, and that he lacked sufficient reason to understand or appreciate his act or the reasonableness and the consequences of his act, then it may be said that such person is mentally incompetent to do the thing against which complaint is lodged.
>
> (Authority cited.)"

[redacted] Furthermore, "The test here is not testamentary capacity. A higher degree of mental competence is required for the transaction of ordinary business and the making of contracts than is necessary for

testamentary disposition of property." In re Estate of Faris, *supra*.

III. Reputable plaintiff called witnesses who were acquainted with decedent, expressed an opinion to the effect she knew and understood the nature and consequences of her acts.

On the other hand, Dr. Deranleau, attending physician, with prior experience in the field of psychiatry, voiced the factually substantiated expert opinion, decedent was utterly incompetent and incapable of any understanding as to what she was signing or the nature of the controverted instruments executed by her. See In re Estate of Van Dyke, 245 Iowa 942, 947, 65 N.W. 2d 63. His testimony in that regard is amply supported by other defense witnesses. Further discussion is unnecessary.

It is to us evident the record, viewed in its entirety, discloses by clear, satisfactory, and convincing evidence, decedent was incompetent at the time she executed the contract and deed here involved. Trial court erred in holding to the contrary.

This case must therefore be reversed and remanded for further proceedings consistent herewith.

Reversed and remanded.

All Justices concur, except REYNOLD-SON, J., who takes no part.