**IN THE COURT OF APPEALS OF IOWA**

No. 4-025 / 13-0489
Filed April 16, 2014

**THE RETREATS AT STONE FOUNTAIN
CONDOMINIUM OWNERS
ASSOCIATION BOARD,**
        Plaintiff-Appellee,

**vs.**

**WANNINGER, L.L.C. an Iowa Limited
Liability Company and JOHN A.
WANNINGER, an Individual Person,**
        Defendants-Appellants.
_____

        Appeal from the Iowa District Court for Dickinson County, Nancy L.

Whittenburg, Judge.


        A condominium developer appeals the district court's decision quieting title

to property in the condominium board.  **REVERSED AND REMANDED**.


        Gregg L. Owens of Maahs & Owens, Spirit Lake, for appellants.

        Lonnie B. Saunders of Chozen & Saunders, Spirit Lake, for appellee.


        Heard by Vaitheswaran, P.J., and Tabor and Bower, JJ.

**TABOR, J.**

This appeal involves a condominium development in which three of four planned buildings were completed.  Due to the housing market's decline in 2007, the developer did not move forward with the fourth building.  But, neither did the developer formally exercise his option to withdraw that building from the horizontal property regime[1] by the deadline set in the declaration.  Owners of the existing condominium units grew worried about the developer's plans to sell the land that would have been occupied by the fourth building.   In 2009, the condominium board filed an action claiming ownership of that vacant lot.  The district court quieted title in the board, and the developer filed this appeal.

Because we see nothing in the horizontal property regime declaration allowing the board to wrest ownership of that real estate from the developer, we reverse the district court's ruling and remand for the entry of an order consistent with this opinion.

## I.	Background Facts And Proceedings

The Retreats at Stone Fountain are condominiums situated near an amusement park and West Okoboji Lake in the City of Arnolds Park.  John Wanninger—real estate owner and managing partner of Wanninger, L.L.C.—

---

[1] The Horizontal Property Act, Iowa Code chapter 499B (2005), governs condominium developments.  "The chief attribute of a condominium development is that the unit owner has fee title to the individual unit, as well as a fractional share of the common elements, subject to restrictions on those property rights by the collective judgment of the owners' association."  17 Iowa Practice Series, Real Estate § 6:1 (2013).  Other courts suggest the word horizontal in this context is a misnomer because "a condominium is actually a vertical property regime composed of horizontal slices of airspace . . . within the vertical column."  *Queen's Grant II Horizontal Prop. Regime v. Greenwood Dev. Corp.*, 628 S.E.2d 902, 912 (S.C. Ct. App. 2006) (citing *Sea Watch Stores Ltd. Liab. Co. v. Council of Unit Owners,* 691 A.2d 750, 753 n.1 (Md. 1997)).

launched the development by filing a declaration establishing a horizontal property regime with the Dickinson County Recorder on April 11, 2005. Spirit Lake attorney James Ladegaard prepared the declaration for Wanninger.

The declaration set out plans for four condominium buildings containing a total of forty-two units. Building A was to include twelve units on the southeast portion of Wanninger's land.[2] Building B housed nine units and was sited in the southwest corner of Wanninger's land; Building C, immediately north of Building B, was to include twelve units; and Building D, immediately north of Building C, was to include nine units.

Under the declaration, ownership of a unit "includes ownership of an undivided one-forty-second (1/42) interest in all general common elements and facilities." The declaration further stated, "general common elements and facilities shall be owned by the individual unit owners as tenants in common and shall consist of the land on which the buildings are erected . . . the lawn, landscaping, shrubbery and general improvements to the grounds."

According to the declaration, administration of the horizontal property regime was to be governed by a board of the condominium owners' association in accordance with the by-laws. The declaration further stated:

> Notwithstanding any other provision in the Declaration or in the By-Laws, the undersigned developers are irrevocably empowered to transact on the property any business relating to construction, sale, lease or rental of units, including the right to

---

[2] John Wanninger transferred the land to Wanninger, L.L.C. by warranty deed recorded on September 30, 2004. There is no issue with this transfer. We refer to the land subject to this warranty deed as Wanninger's land and Wanninger, L.L.C.'s land interchangeably.

maintain signs, employees, equipment and materials on the premises. These rights shall continue until all units have been sold.

The declaration also included the reservation of several rights to Wanninger as the developer. He reserved the right to add additional real estate to the horizontal property regime and to submit one additional building of not more than twelve units. That right was set to expire on July 1, 2015. Wanninger also reserved the right to withdraw Building A and its land from the horizontal property regime. That right expired on July 1, 2009. To exercise these rights, the declaration required Wanninger to execute and record a supplemental declaration.

In late 2007 or early 2008, condominium board members learned Wanninger was trying to sell the empty lot reserved for Building A. Board members worried Wanninger would find an outside buyer who would place a gas station or other "unsightly" commercial enterprise there. They scoured the declaration to determine what remedies, if any, were available to them. They found what they considered "an important date" in the declaration: the July 1, 2009 deadline for Wanninger to withdraw Building A and its land from the horizontal property regime. Board members watched closely to see if Wanninger filed a supplemental declaration by that date. In the meantime, board members maintained the lot by planting evergreens, mowing, and irrigating.

Wanninger did not file a supplemental declaration withdrawing Building A and its land by July 1, 2009.[3]

---

[3] Wanninger did file a supplemental declaration on October 7, 2009.

On July 14, 2009, Mark Arnold, president of the condominium association board, executed and filed an "Affidavit of Possession," asserting the association was "now the record titleholder" of the real estate reserved for Building A.[4] On July 21, 2009, the board filed this quiet title action.[5]

The district court heard evidence on October 4, 2012.[6] Two unit owners and association officers, Jonathan and Janet Reed, testified for the plaintiff-board. Jonathan testified, based on discussions with Wanninger, the board believed the developer did not intend to construct Building A. Jonathan acknowledged that if Wanninger had not effectively withdrawn the property from the horizontal regime, as the board asserted he had not, the declaration provided Wanninger could build on the property "today, tomorrow or whenever." Jonathan also testified the board paid the property taxes on the Building A parcel "as a defensive move" after it filed the quiet title action because board members "were concerned about yet another party becoming involved should someone pick up an interest through a tax sale."

Janet testified board members discussed cleaning up the empty lot because it was "our front yard."[7] She explained the board accepted donations of evergreens to plant on the property because "[w]e didn't own this lot, and it

---

[4] Like the district court, we will refer to this real estate as the Building A parcel.
[5] The board paid $1512.32 in property taxes on the Building A parcel after filing its quiet title action.
[6] The day before the hearing, Wanninger paid the delinquent taxes due on the Building A parcel.
[7] She explained, "[W]hen you come down Highway 71, you've got our buildings, which are quite nice, and then you have the empty lot. And it's dirt and weeds and grass and rocks."

wasn't appropriate to come to the owners on a lot that was not ours to have an expenditure on that."

Defendant Wanninger testified to the progression of the development:

When we had built the first couple of buildings, then the sales were going well. And then we had to—started construction on Building B. Sales slowed dramatically as the real estate market got very difficult, and we [had] to sell units for quite a bit less than we were wanting to. And continuation of the demise of the real estate market made it unviable to build Building A.

Wanninger believed that placing a "For Sale" sign on the parcel signaled his intent to withdraw Building A from the horizontal regime: "My thought was that that gave everybody the knowledge that that's what we intended to do after the real estate market had slowed."[8]

Wanninger also testified the situation had changed by the fall of 2012: "As we see the real estate market finally starting to get some life back, we've had the discussion of going back to construct Building A."

During cross-examination Wanninger did not dispute that the last of the thirty units in the three completed buildings sold in March 2009. He acknowledged "after that date Wanninger, LLC, had no interest in or position on the board of directors of the Stone Fountain Retreats."

Wanninger also called attorney Ladegaard to testify. Ladegaard believed nothing in the declaration he drafted required Wanninger to construct Building A

---

[8] The district court determined Wanninger's actions did not amount to a de facto withdrawal of Building A from the horizontal property regime and his October 2009 filing of a supplemental declaration was untimely. We agree. Wanninger does not pursue this point on appeal. He instead concentrates on the question whether, by failing to withdraw Building A from the horizontal property regime, he somehow forfeited his legal title to the property in favor of the condominium board.

within any specific time period. He also testified nothing in the declaration provided for the property to revert to the homeowners' association if it was not withdrawn from the horizontal regime. In support, Ladegaard pointed to three sections of the declaration: (1) Wanninger's reservation of the right to construct a fifth building in the future; (2) Wanninger's option to build garages on the subject parcel; and (3) provisions requiring any change in each owner's fractional interest in the common areas to be completed by a supplemental declaration.

On November 8, 2012, the district court decided the Building A parcel was "a common element and facility, owned by the individual owners as tenants in common" and quieted title in the board. Wanninger now appeals.

## II.     Standard of Review

Both parties assert our review is de novo because a quiet title action is tried in equity. *See City of Marquette v. Gaede*, 672 N.W.2d 829, 833 (Iowa 2003). "Generally, we will hear a case on appeal in the same manner in which it was tried in the district court." *Johnson v. Kaster*, 637 N.W.2d 174, 177 (Iowa 2001). We agree our review of a district court ruling in a quiet title action is de novo. *Stecklein v. City of Cascade*, 693 N.W.2d 335, 336 (Iowa 2005). While we give weight to the district court's factual findings, we are not bound by them. *Schaefer v. Schaefer*, 795 N.W.2d 494, 497 (Iowa 2011).

To the extent we are called to interpret the declaration creating the horizontal property regime, our review is a matter of law; we are not bound by the district court's reading of the document. *See Oberbillig v. West Grand Towers Condo. Ass'n*, 807 N.W.2d 143, 149 (Iowa 2011).

### III.    Analysis

Horizontal property regimes are governed by their declarations and by-laws.  *See* Iowa Code §§ 499B.1, 499B.4, 499B.14; *Oberbillig*, 807 N.W.2d at 145.  This case requires us to interpret the 2005 declaration filed by property owner and developer Wanninger.  Particularly at issue is paragraph 13 and Wanninger's reservation of the right to "withdraw Building A and the land described on the attached Exhibit C from this Horizontal Property Regime" by a deadline of July 1, 2009.

In analyzing the issue now appealed, the district court recognized the board, as the plaintiff in this quiet title action, assumed the burden of proving ownership.  *See State ex rel. Iowa Dept. of Natural Res. v. Burlington Basket Co.*, 651 N.W.2d 29, 34 (Iowa 2002).  The court also cited case law stating: "Possession is incident to ownership, and in the absence of evidence is presumed to be in the owner," *Tilton v. Bader*, 164 N.W. 871, 874 (Iowa 1917); and "[t]he presumption of ownership which follows the legal title can be overcome only by evidence that is clear and convincing," *Jeffrey v. Grosvenor*, 157 N.W.2d 114, 122 (Iowa 1968).  From this precedent, the district court derived the following framework: "Plaintiff then has the initial burden to prove possession and title and, once established, the burden shifts to the defendant to prove by clear and convincing evidence that plaintiffs do not own the land."

The district court found the board satisfied its burden by showing "record title" to the Building A parcel because "the warranty deeds given to the

purchasers of the condominium units and garages of The Retreats at Stone Fountain fully conveyed all of defendants' record title ownership interests."

The deeds for individual apartments in a horizontal property regime must include a description of the land included in the declaration and "the percentage of the undivided interest appertaining to the apartment in the common areas and facilities." Iowa Code § 499B.5. The Reeds' warranty deed—which the district court referenced in its ruling—included a description of their condominium unit and included the conveyance of "an undivided interest in the general common elements and facilities appertaining to such unit as provided in the Declaration of the Horizontal Property Regime . . . ." The declaration stated ownership of each unit included ownership of "an undivided one-forty-second (1/42) interest in all of the general common elements and facilities described herein."

Perhaps because all of the units in the first three buildings were sold, the district court concluded: "On the record made at trial, the court finds the warranty deeds given to purchasers of the condominium units and garages of The Retreats at Stone Fountain fully conveyed all of the defendants' record title ownership interests." The court also concluded the Building A parcel was a common element and facility owned by the unit owners as tenants in common. We disagree with the district court's conclusions.

The board defends the district court's ruling as follows:

> Appellant established a horizontal property regime and committed all of the real property listed in the Declaration to it. Appellant then proceeded to sell off all of the units that had been constructed until he had none remaining. Once that happened, developer ceased to have an interest in the real property, and the

transition of ownership and governance of the common ground of the condominium regime to the Association kicked in.

The board points to two clauses in the declaration to support its theory. The first is the developer's right to transact business on the property "relating to the construction, sale, lease or rental of units" until "all units have been sold." The second is the developer's right to name all the officers of the association "until all units have been sold, or used personally, rented or leased to others by the Developer or until July 1, 2009, whichever shall occur first."

Addressing the first clause, Wanninger contends "all units" means all forty-two units contemplated by the declaration, including the twelve units anticipated in Building A. He argues the sale of thirty units in the first three buildings does not foreclose his right to transact business on the property. Addressing the second clause, Wanninger concedes he lost the right to name officers to the board on July 1, 2009, but contrasts the right of governance of the condominium association with the act of conveying title to the real estate. He adds: "Neither of those passages has to do with ownership of anything."

The disagreement between the parties centers on the meaning of the phrase "all units" in the declaration and on the ultimate deadline, if any, for Wanninger to construct Building A. In reaching a resolution, we apply the general rules of contract construction to the language of the declaration. *See Oberbillig*, 807 N.W.2d at 150. We also construe the document as a whole rather than looking at particular language in isolation. *See id.*

After viewing the declaration in its entirety, we conclude the reference to selling "all units" unambiguously means all forty-two units described therein. The

test for ambiguity is objective, asking whether the disputed language is "fairly susceptible" to two readings. *See id.* at 150-51. From its opening paragraphs, the declaration anticipated a total of forty-two condominium units. The document repeatedly referred to the fractional one-forty-second (1/42) interest held by each unit owner. The declaration also contemplated, if the developer either submits additional property or withdraws Building A, the required supplemental declaration must set out the change to a unit's fractional interest; for example, if twelve units were added, the fractional interest would become one fifty-fourth (1/54). Under the declaration, the fractional interest held by each unit owner cannot be changed and reduced to one-thirtieth (1/30) in the absence of a supplemental declaration. Thus, the developer's right to continue to transact business on the Building A parcel did not cease when the thirty units in Buildings B, C, and D were sold.

At the hearing the board's attorney suggested the declaration was ambiguous as to the date after which the developer would no longer be allowed to build on the Building A parcel. He asked Wanninger: "Is it your opinion that you should have the opportunity to continue to build on that lot ad infinitum at anytime in the future?" Wanninger replied: "It does not limit us." On appeal, the board argues the failure to make a more specific statement about a construction deadline for Building A must be construed against Wanninger, the party who drafted the declaration.

It is true our courts will construe ambiguous boilerplate language in a contract against the drafter. *Peak v. Adams*, 799 N.W.2d 535, 548 (Iowa 2011).

But the declaration here does not suffer from ambiguous boilerplate. Instead, the declaration is arguably missing a term, that is, an end date for the developer to construct Building A. But, the absence of a construction deadline in the declaration for Building A is not the issue.[9] Rather, at issue is the district court's reading of the declaration as "fully divesting" the developer of the ownership interest in the Building A parcel after "the last unit was sold" in March 2009. The district court's interpretation is not supported by any language in the declaration. Courts do not have the power to rewrite a contract in the guise of construction and create a better deal for one of the parties than consummated in the original bargain. *Smith v. Stowell*, 125 N.W.2d 795, 799 (Iowa 1964).

The developer lost control of the condominium's governance on July 1, 2009, as specified in the declaration. But, that milestone did not result in the transfer of the Building A parcel's title from the developer to the unit owners. The distinction between the transfer of management of a condominium association and the transfer of ownership of real estate within a horizontal property regime is discussed in the Restatement (Third) of Property chapter 6, at 66 (2000).[10] In *Oberbillig*, our supreme court relied on Restatement chapter 6 to guide its

---

[9] The district court concluded Wanninger did not presently have "a viable plan for constructing Building A." But the court ultimately held: "In the end, Wanninger's ability to build building A does not affect the issue of whether Plaintiff has proven by clear and convincing evidence that it holds legal title, and defendants have failed to show by clear and convincing evidence the plaintiff does not."

[10] "The American Law Institute added chapter 6 to the Restatement of Property in 2000 to cover the rapidly growing body of community association law. . . . Three strands of law come together in the law governing residential common-interest communities: the law of servitudes; the law governing the forms of ownership used in the community; and the law governing the vehicle used in the community for management of commonly-held property or provision of services." Donna S. Bennett, *Condominium Home Ownership in the United States*, 103 Law Libr. J. 249, 277 (Spring 2011).

analysis of the horizontal property declaration at issue. 807 N.W.2d at 150. We do the same here.

Chapter 6 discusses a developer's duty to create an association and to then turn over control to the association members. *See* Restatement (Third) Property § 6.19, at 304. Initially, the developer is in the best position to create the association due to (1) his or her resources, (2) his or her ability to coordinate the declaration and by-laws, and (3) his or her ability to ensure all units in the community are included. *Id.* at 304-05, cmt. a. But as time goes on, the interests of the developer and the unit purchasers diverge: the developer's interest is in completing and selling the project; while the unit purchasers' interest is in "maintaining their property values and establishing the quality of life they expected when buying the property." *Id.* at 305, cmt. a. The comments also provide:

> Whether and how long the developer needs to retain control of the association to protect its interest can depend on the extent of the other rights it enjoys by virtue of the governing documents or applicable statutes. If it is protected against interference with its ability to build out and market the project as planned, control of the association may not be necessary, or may be necessary for a shorter period of time, than if those protections are absent.
> In projects with multiple phases that will be developed over a substantial period of time, more flexibility in the required transfer of control may be appropriate. Sold-out phases of the project can be given control over the local aspects of the project without jeopardizing the developer's ability to complete the project in accord with the plan.

*Id.* at 305, cmt. b.

The divergent interests of the developer and the association board, described above in the comment, are reflected in the facts before us. The 2005

declaration of horizontal property regime filed by Wanninger required him to cede managerial control of the association board by July 1, 2009, while at the same time protecting his interest in further developing his real estate past that date and protecting his discretionary option of adding other property to the regime until July 1, 2015. Accordingly, under the declaration, selling out three phases of the regime's four-to-five phase project did not result in developer-Wanninger losing his prior legal title to the undeveloped real estate within the regime—Building parcel A.

Further support for this result is found in Iowa's doctrine of adverse possession. We note board members and unit owners took action due to their concerns Wanninger would sell the vacant lot, Building A parcel, for commercial purposes. They believed such a sale could lower their property values or conflict with the quality of life they expected when joining the residential community. But the condominium board's strategic decision (maintain Building A parcel and pay delinquent property taxes for a year or two) did not result in the unit owners' acquisition of the title to the Building A parcel. The law presumes possession is under regular title, and the doctrine of adverse possession is strictly construed. *Louisa Cnty. Conservation Bd. v. Malone*, 778 N.W.2d 204, 207 (Iowa Ct. App. 2009). It is undisputed Wanninger had regular title. To claim title by adverse possession, a party must show hostile, actual, open, exclusive, and continuous possession, under claim of right or color of title for at least ten years. *Id.* Here, the condominium board filed its affidavit of possession and its quiet title action challenging Wanninger's legal title with far less proof of a right to take ownership

of the Building A parcel than the proof required of a party successfully pursuing an adverse-possession claim after a ten-year period. Clearly, the maintenance and tax-payment actions did not strip Wanninger of his legal title.

## IV.    Conclusion

The 2005 declaration of horizontal property regime required developer Wanninger to cede managerial control of the association board by July 1, 2009. At the same time, the declaration protected Wanninger's interest in further developing his property past that date and his discretionary option of adding other property to the regime until July 1, 2015. Accordingly, under the declaration, the developer selling out the units in three buildings did not result in the developer losing his legal title to the undeveloped real estate originally within the regime, the Building A parcel. We remand to the district court for the entry of an order consistent with this opinion.

**REVERSED AND REMANDED.**