# IN THE COURT OF APPEALS OF IOWA

No. 16-0408
Filed March 8, 2017

**ESTATE OF DOROTHY HARRIS,**
        Plaintiff-Appellee,

**vs.**

**RANDALL EVERETT HARRIS, HIS UNKNOWN SPOUSES, HEIRS, DEVISEES, GRANTEES, ASSIGNEES, SUCCESSORS IN INTEREST AND THEIR UNKNOWN SPOUSES AND THE PARTIES IN POSSESSION AND UNKNOWN CLAIMANTS OF THE FOLLOWING DESCRIBED REAL ESTATE SITUATED IN FLOYD COUNTY, IOWA,**
        Defendants-Appellants.
_____

        Appeal from the Iowa District Court for Floyd County, Christopher C. Foy,

Judge.


        Randall Harris appeals from the district court's order setting aside a quit

claim deed.  **AFFIRMED.**



        Roger L. Sutton of Sutton Law Office, Charles City, for appellants.

        Rodney E. Mulcahy of Eggert, Erb, Mulcahy & Kuehner, P.L.L.C., Charles

City, for appellee.



        Heard by Mullins, P.J., and Bower and McDonald, JJ.

**MULLINS, Presiding Judge.**

Randall Harris appeals from the district court's order setting aside a quit claim deed executed by his mother, Dorothy Harris, which conveyed real estate to him. He asserts the district court erred in finding the Estate proved Dorothy lacked sufficient mental capacity to execute the quit claim deed by clear, convincing, and satisfactory evidence. Upon our de novo review, we affirm the district court's order setting aside the quit claim deed and declaring it void.

## I. Background Facts and Proceedings

On March 31, 2011, Dorothy signed a quit claim deed conveying her home and surrounding acreage (totaling thirteen acres) to her youngest son, Randall. The deed was recorded on April 8, 2011. Dorothy was divorced and never remarried. Dorothy had three sons: Richard, Robert, and Randall. She raised her children in Texas and worked as a machinist prior to moving to Iowa to care for her aging parents and continue working as a machinist here.

For several years, Randall and his daughter lived with Dorothy on her acreage near Floyd, Iowa. In 2008, Dorothy signed paperwork appointing Randall as her durable power of attorney for medical care and general matters. Dorothy's son, Robert, resided in Texas with his wife and youngest child. Robert and his wife visited Dorothy several times a year and stayed at her home during their visits. Robert also spoke on the phone with his mother frequently. Robert's son, Eric, had lived with Dorothy in Iowa during his high school years. At all times relevant to this appeal, Eric lived in Jewell, Iowa, with his family but owned real estate near Dorothy's home and visited her often. Dorothy lived at home until January 2012 when she was moved to a long-term care facility. Randall

continued to reside at Dorothy's home after Dorothy left and was still living there at the time of trial.

Following Dorothy's death in August 2012 at the age of eighty-two, her grandson, Eric, was appointed administrator of her estate. On July 15, 2013, the Estate of Dorothy Harris filed a petition for quiet title, alleging Dorothy was not mentally competent to sign the March 2011 quit claim deed. Subsequently, Dorothy's last will and testament was found. Her will nominated and appointed Randall to serve as executor. Randall filed an application to remove Eric as the administrator in this matter. Ultimately, the court appointed a corporate administrator of the Estate. Thereafter, the corporate administrator proceeded with the petition for quiet title. On January 6, 2015, the court dismissed the Estate's case pursuant to Iowa Rule of Civil Procedure 1.944 for failure to prosecute. The Estate filed an application to reinstate, which the court granted.

The matter came on for trial on March 18, 2015. At trial, the Estate presented evidence of Dorothy's declining mental functioning over the last three to four years of her life. In November 2008, Randall took Dorothy to see a physician, Dr. Mark Haganman, due to concerns about memory loss. Dr. Haganman diagnosed Dorothy with dementia, describing it as a "[c]ognitive impairment moderately severe likely Alzheimer's type," and prescribed Dorothy medication to prevent further memory loss. Dorothy never took the medication. Dorothy saw Dr. Haganman again in July and November 2010. In November, Dr. Haganman observed a "significant, profound decline" in Dorothy's mental functioning. The record noted Randall was "alarmed about her progression" regarding her memory impairment. The record further noted Dorothy "is very

poorly kept, filthy clothes, her hands and feet and chest and face are filthy, and her hair is poorly kept as well. She is oriented to person and confused to place and time."

In February 2011, Dorothy received treatment from Dr. Haganman for an open, nonhealing wound on her leg. Because Dorothy was unable to care for the wound on her leg properly at home, Dr. Haganman admitted Dorothy to the hospital for a period of one week. Dr. Haganman opined Dorothy suffered from Alzheimer's disease and lacked the mental capacity to care for herself or manage her financial affairs. Upon discharge, Dr. Haganman recommended Dorothy enter skilled nursing for changing the bandages on her leg wound, but Randall objected and insisted upon taking her home. Randall returned with Dorothy the following day and stated he could not take care of her. The next day, a home health nursing agency faxed a letter to Dr. Haganman stating its refusal to care for Dorothy at her home due to its unsafe and unsanitary conditions. Subsequently, Dorothy was placed in a nursing home for rehabilitation.

Mary Lovik, a physical therapy assistant who worked with Dorothy three times a week for wound care while she was in rehabilitation in February and March 2011, observed Dorothy to have poor short-term memory and require help with personal care. Lovik testified her conversations with Dorothy "dealt with . . . repeated topics. I had to reintroduce myself constantly to her during this time I had her for that one hour." Lovik testified it was obvious Dorothy "had some dementia" and needed help dressing herself and taking care of her wound. She also stated Dorothy was unable to maintain her own activities of daily living.

Dorothy stayed in the nursing home for twenty days, after which Medicare no longer fully covered her stay and she returned home.

Dorothy saw Joanne Robinson, a nurse practitioner, three times from mid- to late-March 2011 for wound care for her leg. Robinson noted Dorothy had dementia of the Alzheimer's type and was confused, fidgety, and unfocused. She also noted Dorothy had poor hygiene and appeared unkempt. In her notes, Robinson wrote, "[Dorothy] is quiet. She seems to be a little out of touch with reality. Most of her answers are appropriate, but her judgment seems to be impaired." Robinson recommended Dorothy start medication that would not reverse Alzheimer's but may preserve some of the intellect she had left. At the end of March, Robinson referred Dorothy to another home care nursing agency. Again, the nursing agency refused to see Dorothy at her home because it was dirty and unsafe. On March 29, Robinson noted Dorothy was "confused and forgetful," "partially oriented," and still unable to care for her leg wound. Robinson attempted to administer a mini mental status examination, but Dorothy refused to participate. Robinson diagnosed Dorothy with Type 2 diabetes. Robinson recommended to Randall that Dorothy go to a nursing home, but Randall did not want Dorothy to go to a nursing home and insisted he would take care of her.

Robert testified he began to notice a substantial decline in his mother's mental functioning in 2008. He testified Dorothy started calling him by the wrong name and repeating things she said when they talked on the phone or when he visited. She once got lost, and someone had to locate her and help her get home. She also started doing "compulsive things," such as peeling walnuts.

Robert also testified the condition of his mother's home started steadily declining around the same time. Dorothy took on numerous cats that urinated and defecated inside her home. Her own hygiene and personal care began to decline as well: her clothes were dirty, her hair was not maintained, her shoes were worn and tattered, she ate meals sporadically, and she stopped properly taking care of her medical needs.

Robert also testified that when he visited his mother in August 2011, he noticed the condition of the home to be "in serious decline"—there were still cats in the home and there was a refrigerator that was not working because the cord had been cut. Robert stated he offered to replace the refrigerator, which led to a disagreement between himself and Randall, and Randall asked Robert to leave the home. Robert testified it was at that point he learned the property had been transferred to Randall and Dorothy "was not aware of it at the time." Robert testified he asked Randall to transfer the deed back to Dorothy but Randall refused. Robert testified he then took Dorothy to see an attorney to have documents prepared to put the property back into Dorothy's name but the attorney believed Dorothy to be mentally incompetent and refused to prepare the paperwork. After that, Robert filed a petition for guardianship for his mother due to her incompetency. Robert and Eric were eventually appointed temporary co-conservatives for Dorothy. Shortly thereafter, Dorothy was moved to a long-term care facility, and Randall refused to allow Robert or Eric onto the property.

Eric testified he started noticing a decline in his grandmother's mental abilities in 2008. He testified Dorothy did not remember asking questions and repeated them and also started checking the mailbox several times a day. He

stated she stopped showering, was not wearing clean clothes, and was not standing straight. He also started to notice a decline in her housekeeping when her home had previously been well-maintained. Eric stated Dorothy was confused about where he lived. Her recognition of his wife and children diminished over the years, and she did not remember her neighbors when they visited.

Nathaniel Schwickerath, the attorney who prepared the quit claim deed on March 31, 2011, also testified at trial. Schwickerath testified that, when Dorothy and Randall came into his office that day, he knew Dorothy was ill and wanted to do some Title 19 planning and her only asset was the real estate. He met with Randall and Dorothy together for approximately fifteen to twenty minutes and then met individually with Dorothy for about the same time because she seemed "frail" and he wanted to "make sure that this was what she wanted and not what someone was forcing on her." Schwickerath testified Dorothy expressed concern over keeping the real estate within the family and she was worried Randall and his daughter would be put out on the street if something were to happen to her or she were required to sell the real estate. He testified Dorothy appeared to have some physical difficulties, "[b]ut she was sharp as far as she—her understanding. She was able to pay attention and could—could understand what I was explaining to her." He testified he "felt comfortable that she was smart enough to know what she was doing on a business basis" and "to make her choices as to what she wanted to do," or he would not have completed the transaction. He further testified Dorothy was "a little quiet and reserved initially" but was dressed appropriately and was clean. Schwickerath also stated it was clear Dorothy

understood the effect of the deed she was signing and that it was irrevocable. He testified that, when he met with Dorothy on March 31, he was unaware of her diagnosis of dementia and Alzheimer's disease or her will, which provided all of her assets be split equally among her living children. Finally, Schwickerath testified he only saw Dorothy on that one occasion.

Randall's daughter testified she moved out of her grandmother's home in 2011. She acknowledged Dorothy displayed behaviors consistent with dementia and Alzheimer's disease but was meticulous in ensuring she understood what she was signing when her granddaughter asked her to sign paperwork for school.

Randall testified his mother was of sound mind when she signed the deed on March 31, 2011, and did so of her own free will. He testified Dorothy's mind was sharp, she was still able to manage her daily affairs for the most part, but her short-term memory "was an issue." He testified Dorothy bathed and dressed herself but repeated things she said, she called him and Robert the wrong names, checked the mail repeatedly, and was "real fidgety and just moving all the time and real just unrelaxed." He also testified she consumed alcohol and caffeine heavily and functioned better when she was off them. Randall did not help Dorothy much with housekeeping or cooking and testified they ate out often when Dorothy stopped cooking regularly.

Randall testified that, prior to preparing the deed on March 31, "the original intent was to split the property up three ways," but that proved "to be pretty difficult to do," so "we thought it would be best to just get it put into my name. And then I could—If there was going to be any divisions, I could do that at

a later time." He testified it was left to him to make the decision of whether the property would be divided among the brothers based "on how much money and burden [he] put into the place against the burden [his brothers] put into the place." Randall estimated he put approximately $41,000 worth of repairs into Dorothy's home over time and had attempted to file a mechanic's lien on the house. He testified he had put more into the house than it was worth and there was a medical assistance debt on the property for Dorothy with a judgment of $21,116 that he had assumed. He also stated, "I offered to give them guys that—the place if they would bring my mother back there to that house where she wanted to stay and take care of her. I—I told them I would leave and they could have the whole thing." Randall believed Robert and Eric had forced Dorothy out of her home. Randall did not see his mother again after she left the home in January 2012.

On February 2, 2016, the district court entered an order setting aside and declaring void the quit claim deed, finding the Estate had proved by clear, convincing, and satisfactory evidence that Dorothy lacked sufficient mental capacity to execute a quit claim deed conveying real estate to Randall. The court noted, "When faced with conflicting evidence, the Court generally found the testimony of the witnesses for the Estate more credible than the testimony of Randall and his witnesses." Specifically, the court noted "the demeanor and attitude of Randall on the witness stand caused the Court to view his testimony very skeptically. The Court also notes that Randall and his witnesses gave inconsistent testimony regarding various matters." The court relied on the sworn testimony of Dr. Haganman and Nurse Practitioner Robinson that "Dorothy was

suffering from a debilitating form of dementia in the early months of 2011 and . . . lacked the mental capacity to care for herself or to understand or handle her own financial affairs." The court further relied on Dorothy's inability "to maintain her personal hygiene, keep her home clean, and limit the number of cats living in her home in late 2010 and early 2011" as "additional proof that her mental capacity was significantly impaired." Randall appeals.

## II. Standard of Review

This matter was tried in equity; thus, our review is de novo. *See* Iowa R. App. P. 6.097. We give weight to the factual findings of the district court, especially regarding witness credibility, but we are not bound by them. *See* Iowa R. App. P. 6.904(3)(g).

## III. Analysis

### A. Mental Capacity

Randall claims the district court incorrectly determined Dorothy lacked sufficient mental capacity to execute the deed transferring the property to him. "The party alleging lack of mental capacity sufficient to execute a deed has the burden of proving by clear, convincing, and satisfactory evidence that the grantor did not possess 'sufficient consciousness or mentality . . . to understand the import of her acts' when the deed was executed." *Daughton v. Parson*, 423 N.W.2d 894, 896 (Iowa Ct. App. 1988) (quoting *Costello v. Costello*, 186 N.W.2d 651, 654 (Iowa 1971)); *see also In re Estate of Baessler*, 561 N.W.2d 88, 92 (Iowa Ct. App. 1997), *abrogated on other grounds by Jackson v. Schrader*, 676 N.W.2d 599 (Iowa 2003). "A higher degree of mental competence is required for the transaction of ordinary business and the making of contracts than is

necessary for testamentary disposition of property." *Daughton*, 423 N.W.2d at 896.

It has long been established that, when examining the issue of mental capacity, a court may consider

> [the grantor's] physical condition; the adequacy of consideration; whether or not the conveyance was improvident; the relation of trust and confidence between the parties to the conveyance, and the weakness of mind of the grantor as judged by h[er] other acts within a reasonable time prior and subsequent to the act sought to be impeached.

*Id.* (quoting *Brewster v. Brewster*, 188 N.W. 672, 674 (Iowa 1922)). We also consider "the lack of independent advice as another relevant factor in determining mental capacity." *Id.* (citing *In re Estate of Herm*, 284 N.W.2d 191, 200 (Iowa 1979)).

At the time of the transfer, Dorothy had a nonhealing wound on her leg that she was unable to care for, and she often appeared dirty and unkempt with poor hygiene. Dorothy was diagnosed with Type 2 diabetes a mere two days before the transfer of real estate occurred. Attorney Schwickerath testified Dorothy appeared "frail" when he met with her and he made sure he met with her individually because he was concerned someone might be forcing her to transfer her property when she did not want to. Based on these facts, it is obvious Dorothy was in poor physical condition when she executed the deed.

Next, we note consideration for the transfer was for the nominal amount of one dollar. After the transfer of the property was complete, Dorothy essentially had no assets other than her personal property; thus, the conveyance may have been improvident. Further, Randall and his daughter lived with Dorothy. Dorothy

relied on Randall to purchase groceries, to drive her to and from medical and appointments, to care for her leg wound, and to make improvements to her property that she had previously made herself.

Additionally, we give deference to the district court's finding that the Estate's witnesses were more credible on the issue of Dorothy's mental capacity than Randall and his witnesses. The court relied heavily on the testimony of Dr. Haganman and Nurse Practitioner Robinson. In February 2011, Dr. Haganman opined Dorothy suffered from Alzheimer's disease and lacked the mental capacity to care for herself or manage her financial affairs. Physical Therapist Assistant Lovik stated Dorothy was unable to maintain her own activities of daily living. On March 29—two days before Dorothy met with Schwickerath—Robinson noted Dorothy's diagnosis of dementia of the Alzheimer's type and observed Dorothy to be "confused and forgetful" and only "partially oriented." Dorothy's medical providers clearly believed Dorothy was mentally incompetent to conduct business regarding her financial affairs. Furthermore, Robert, Eric, Randall, and Randall's daughter all testified Dorothy had experienced a decline in mental functioning, although they disagreed on the extent of her decline.

Dorothy did not receive independent advice regarding the transfer of her property to Randall. Randall contacted Schwickerath and took Dorothy to meet with him for the sole purpose of preparing a deed to transfer the property. Schwickerath met with Dorothy and Randall for less than an hour—meeting with Dorothy individually for only fifteen to twenty minutes—before he prepared the deed and Dorothy signed it. Schwickerath did not know about Dorothy's

diagnoses and was unaware of her will, which provided all of her property was to be divided equally among her children.

Based upon the foregoing facts and giving deference to the district court's credibility findings, we find the Estate presented clear, convincing, and satisfactory evidence that Dorothy lacked the requisite mental capacity to execute the deed transferring real estate to Randall. We affirm the district court's order setting aside the deed and declaring it void.

### B. Attorney Fees

Both parties request an award of appellate attorney fees. Randall requests appellate attorney fees of $4000. The Estate requests appellate attorney fees of $2000. Neither party cites authority in support of its claim for appellate attorney fees. Therefore, we decline to award appellate attorney fees to either party. *See* Iowa R. App. P. 6.903(2)(g)(3) ("Failure to cite authority in support of an issue may be deemed waiver of that issue."); *see also Roberts Equip. Div., Inc. v. Silver Lake Farms, Corp.*, No. 12-040, 2012 WL 5356126, at *5 (Iowa Ct. App. Oct. 31, 2012).

### IV. Conclusion

Based upon our de novo review of the record, we find the Estate presented clear, convincing, and satisfactory evidence that Dorothy lacked the requisite mental capacity to execute the deed conveying real estate to Randall. We affirm the district court's order setting aside the deed and declaring it void. Additionally, because neither party cited any authority in support of its claim for appellate attorney fees, we decline to award them.

**AFFIRMED.**